**IRON WORKERS LOCAL UNION NO. 167 INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 74–1749.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1975.

Decided May 27, 1975.

Jerry L. Gardner, Jr., New Orleans, La., with whom C. Paul Barker, New Orleans, La., was on the brief for petitioner.

Janet McCaa, Atty., N. L. R. B., for respondent. John S. Irving, Deputy Gen. Counsel, Patrick H. Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert C. Sewell, Atty., N. L. R. B., were on the brief for respondent.

Harry L. Browne, Kansas City, Mo., filed a brief on behalf of the Glazing Contractors Labor Committee as amicus curiae urging reversal.

Before BAZELON, Chief Judge, WRIGHT, Circuit Judge, and WEIGEL,[*] United States District Judge for the Northern District of California.

Opinion for the Court filed by Chief Judge BAZELON.

BAZELON, Chief Judge:

The Binswanger Glass Company entered into a subcontract for installation of metal curtain-wall on a building in Memphis, Tennessee. Curtain-wall construction involves erection of surfacing materials and a metal framework therefor, which passes the "spandrel" section of a building, i. e. the space from the top of a window to the sill of a window on the succeeding floor. This mode of construction is a highly skilled craft and one of obvious necessity to the modern building trades industry. Binswanger is a member of the Memphis Glass Contractors which enjoys a multi-employer collective bargaining agreement with Glaziers and Glass Workers Local 242, also of Memphis. Glaziers Local 242 is affiliated with the International Brotherhood of Painters, Decorators and Paperhangers. The collective bargaining agreement between the Memphis Glass Contractors and Glaziers Local 242 requires that metal curtain-wall construction within the jurisdiction of Local 242 is to be assigned to the members of that union. Thus it was that Binswanger assigned the metal curtain-wall construction on the Memphis building to Local 242.

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(d).

This assignment practice disturbed Iron Workers Local 167, affiliated with the International Association of Bridge, Structural and Ornamental Iron Workers. Therefore, on March 19, 1973, three agents of Local 167 informed Binswanger's contract manager that if Binswanger did not retract its assignment of the metal curtain-wall construction to the Glaziers and re-assign the work to the Iron Workers, the Iron Workers would be forced to pressure the general contractor on the building job to make the assignment, presumably by in turn exerting pressure on Binswanger. On April 2, 1973, the Glaziers filed a Section 8(b)(4)(ii)(D)[1] unfair labor practice charge against the Iron Workers for exerting economic pressure to effect a work assignment. On May 3, 1973, the Regional Director obtained a temporary injunction against further pressure by Local 167.[2] Pursuant to its practice in these matters,[3] the Labor Board deferred action on the unfair labor practice complaint and conducted a hearing under Section 10(k) of the National Labor Relations Act,[4] a provision which in effect requires Board arbitration of work assignment disputes. However, under Section 10(k) the Board may conduct a binding arbitration only if *all* parties[5] to the work assignment dispute have not submitted to the Board "satisfactory evidence that they have . . . agreed

upon methods for the voluntary adjustment of the dispute." The Iron Workers argued to the Board in the 10(k) proceeding that a method of voluntary adjustment had been agreed upon by the parties. The Board rejected this argument and went on to assign the work to the Glaziers.[6] The Iron Workers did not abide by this assignment. Therefore, the Board, reaffirming its 10(k) decision, re-activated the 8(b)(4)(ii)(D) charge and found the Iron Workers in violation thereof.[7] The Iron Workers petition for review, again arguing that the parties have agreed upon a method of voluntary adjustment and that the Board erred in finding they had not. We are persuaded by the Iron Workers' argument. We have no occasion to consider any arguments for reversal of the Board other than the point concerning agreement to a method of voluntary adjustment.

Prior to 1961, the Iron Workers and the Glaziers suffered a series of divisive jurisdictional disputes that caused much loss of wages and construction time. In order to rectify this situation, the International representatives of the two groups agreed on February 22, 1961 to a plenary system for resolving work assignment disputes between the two unions. This 1961 agreement, known as the "Blue Book Agreement", was signed by the presidents of both Internationals

---

1. 29 U.S.C. § 158(b)(4)(ii)(D) (1970); *see* NLRB v. Radio and Television Broadcast Eng'rs, Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961).

2. Reynolds v. Local 167, Iron Workers, Civ. No. 73–159 (W.D.Tenn. May 3, 1973).

3. *See* NLRB v. Local 79, Plasterers, 404 U.S. 116, 123–24, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971); NLRB v. Radio and Television Broadcast Eng'rs, Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961).

4. 29 U.S.C. § 160(k) (1970). This 10(k) determination is not legally binding on any party. *See* International Tel. and Tel. Corp. v. Local 134, Electrical Workers, 419 U.S. 428, 95 S.Ct. 600, 611, 42 L.Ed.2d 558 (1975), *quoting* NLRB v. Local 79, Plasterers, 404 U.S. 116, 122 n. 10, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971). However, for all practical purposes failure to abide by a 10(k) determination will usually mean a

8(b)(4)(ii)(D) violation for the union or the loss of such a charge to an employer or rival union. *Id.* at 126–27, 92 S.Ct. 360.

5. *See* NLRB v. Local 79, Plasterers, 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971) (interested employer must agree to the method of voluntary adjustment in order for the Board to defer under 10(k)).

6. Local 167, Iron Workers, 207 N.L.R.B. No. 56 (1973).

7. Local 167, Iron Workers, 211 N.L.R.B. No. 70 (1974). Section 10(k) specifically requires that if a method of voluntary adjustment is agreed upon and followed, then a 8(b)(4)(ii)(D) charge must be dismissed *pro tanto* ("[U]pon such voluntary adjustment of the dispute, such charge shall be dismissed."). Thus, in order to be sustained, the Board must prevail in its argument that no voluntary method of adjustment exists.

and approved by both general executive councils. Article VII of the Blue Book specifically and unmistakenly assigns metal curtain-wall construction to the Iron Workers, with the exception of the insertion of glass panes. Article X of the Blue Book provides that if "a dispute should arise over the interpretation or application of this agreement", there shall be attempts at a voluntary settlement by local business agents and by the presidents of the Internationals. If this is not successful, Article X provides for binding arbitration before the AFL–CIO National Joint Board for the Settlement of Jurisdictional Disputes.

Simultaneous with the Blue Book, the Iron Workers and the National Joint Trade Board of the Glass and Glazing Industry entered into an agreement to abide by Articles I–IX of the Blue Book, which, of course, includes Article VII. Attached to this was a Stipulation which provided that the stipulators "on behalf of themselves and as contractors affiliated with the National Joint Trade Board of the Glass and Glazing Industry" agreed to abide by Articles I–IX of the Blue Book but not Article X. This stipulation was signed by Binswanger. The distinction of the stipulators was that they all had collective bargaining agreements with the Glaziers. A third piece of paper also executed on February 22, 1961 established an "Administrative Committee" whose function was "to process disputes over the application, interpretation and administration of the Agreement of February 22, 1961 between the [Iron Workers] and the [Glaziers]." The Administrative Committee is composed of a representative of the National Joint Trade Board, the Glaziers and the Iron Workers. In the event these three parties could not agree, the matter was to be referred to another party for binding arbitration. This Administrative Committee agreement was signed by the two International presidents and the Chairman of the National Joint Trade Board.

■ The Board reasoned thus: Since Binswanger by the express terms of the Stipulation did not agree to Article X of the Blue Book, it had not agreed to a *method* of voluntary adjustment[8] of work assignment disputes. The Board assumed for purposes of decision that Local 242 of the Glaziers was bound by the action of the International in signing the Blue Book Agreement,[9] but that since Binswanger, one party to the dispute, had not agreed to a method of voluntary settlement, the Board was not deprived of 10(k) jurisdiction. As to the Administrative Committee, the Board held that it "is designed to deal with interpretations of contract terms and changes but not jurisdictional disputes since the contract has specific machinery for deciding jurisdictional disputes in section X of the contract. As noted above, the Employer herein is not bound to the provisions of section X."[10]

This reasoning leaves a great deal to be desired. All parties agree that Binswanger is not bound by Article X; there is no dispute on that issue. The

8. The plain language of Section 10(k) requires that the parties agree to a method of adjustment or actually adjust the dispute in order for the Board to defer and to dismiss any 8(b)(4)(ii)(D) charges. This presents a minor conceptual problem in cases such as the one before us here where the parties have admittedly agreed to a principle of work assignment that controls the dispute but have arguably not agreed to an arbitration formula for enforcing the contract or for one reason or another choose to ignore the previous agreement. The Board did not focus on the question of whether an unmistakable agreement to assign work in a particular manner later violated and containing no provision for arbitration is itself a sufficient adjustment of the dispute within the intendment of 10(k). Presumably without arbitration, the party injured by breach could seek the aid of local courts to interpret and perhaps specifically enforce the agreement.

9. Local 167, Iron Workers, 211 N.L.R.B. No. 70 (1974), Joint App. at 4.

10. *Id.*, Joint App. at 6. The Board's interpretation of the Administrative Committee agreement is not informed by any labor policy but is merely contract interpretation. It is therefore entitled to no deference. *See* Local 455, Retail Clerks v. NLRB, 166 U.S.App.D.C. 422, 510 F.2d 802, 805 (1975).

Administrative Committee structure, however, is clearly a substitute for Article X when an employer is concerned about the dispute. We find that the Administrative Committee is the exact analogue of Article X except as to the composition of the arbitration group. Article X involves generally disputes between building trades unions and the building trades industry and thus refers the disputes to the National Joint Board for the Settlement of Jurisdictional Disputes. It is not surprising that a specific building trades employer group might wish to have its interests adjudicated by an organization in which it had a veto power. Upon comparison of the language of Article X and the Administrative Committee agreement[11] and a consideration of the fact that both were signed on the same day with a stipulation that the employers were not bound by Article X, the inference becomes irresistible that the Administrative Committee is designed to arbitrate jurisdictional or work assignment disputes. As such, it is clearly an agreed-upon method of voluntary adjustment of such disputes within the intendment of Section 10(k).

The Board tells us that the Administrative Committee is not designed to deal with work assignment disputes but rather with interpretation of contract terms. But the only terms in the relevant contract, Articles I–IX of the Blue Book, which are there to interpret, concern adjustment of work assignment disputes.[12] There is no distinction between interpretation of contract terms and dealing with jurisdictional disputes. The two are one and the same. Of course, this view is premised on the fact that the employer, Binswanger, is bound by Articles I–IX. As to the remainder of the Board's argument, we think it is entirely circular. The Board infers that the Administrative Committee is not designed to deal with jurisdictional disputes because Article X is established for that purpose. But the Board nullifies its own argument when it points out the obvious fact that Binswanger is not bound by Article X. Therefore, the existence of Article X is no argument that the Administrative Committee is not designed to arbitrate work assignment disputes. We reject the Board's position.

We think the real issues in this case are whether Local 242 of the Glaziers and Binswanger are bound by the actions, respectively, of their International and employer organization. The Board expressly refused to decide whether Local 242 was so bound and the issue of Binswanger's position was apparently not considered.[13] We thus have no record upon which to decide these issues. We conclude further review of these issues by the Board is in order. We thus grant the petition for review, set aside the Board's order and remand the case for proceedings consistent with this opinion.

So ordered.

11. The language of the two provisions is quoted on 170 U.S.App.D.C. ——, 517 F.2d 186 *supra*. Both provisions speak in terms of the "interpretation" and "application" of the agreement.

12. The Blue Book Agreement is reprinted at Joint App. 293–300. All Articles of the agreement, except X and the preamble, describe the manner in which specific work assignment disputes are to be resolved. The Administrative Committee agreement also speaks in terms of "administration" of the Blue Book, as well as "interpretation" and "application." The only referent of these terms must be specific work assignment disputes. The fact that no evidence was adduced that the Committee had resolved work assignment disputes in the past is not relevant in this case since the plain words of the agreement permit no other meaning except that the Administrative Committee is to resolve work assignment disputes. *Cf.* Local 455, Retail Clerks, 166 U.S.App.D.C. 422, 510 F.2d 802, 805–06 (1975). Furthermore, the absolute specificity of the various Articles of the Blue Book in settling work assignments means that the Committee will not have to engage in any highly factual arbitration but rather only in interpreting whether the quite unmistakable command of Article VII applies to a given construction job. That truly is a matter of contract "interpretation" as well as a method of voluntary adjustment of work assignment disputes. *Cf.* note 8 *supra*.

13. *See* note 9 *supra*. The question of Binswanger's obligation to abide by the Administrative Committee agreement is tangentially suggested by Brief for the NLRB at 18–19.